ESTATE OF PETERSON: PETERSON and others, Appellants, vs. TRAVIS, Respondent.*

*January 15—April 8, 1947.*

* Motion for rehearing denied, with $25 costs, on June 10, 1947.

*Arnold C. Otto* of Milwaukee, for the appellants.

For the respondent there was a brief by *Affeldt & Lichtsinn,* attorneys, and *Eldred Dede* of counsel, all of Milwaukee, and oral argument by *H. F. Lichtsinn.*

ROSENBERRY, C. J.  The testator had no children.  His wife predeceased him on March 27, 1940.  The testator at the time of his death owned personal property of the appraised value of $9,550.60 and real estate of the appraised value of $18,360.

The circumstances relating to the execution of the will are as follows: On the morning of March 27, 1940, John M. O'Brien, an able lawyer of seventeen years' experience, was asked by Irene Travis to come to the Layton Home as her uncle, August Peterson, desired to make a will.  Mr. O'Brien answered the call and not without some difficulty procured from Mr. Peterson the information necessary for the drafting of the will.  About 3 o'clock in the afternoon of the same day, Mr. O'Brien returned to the Layton Home with the draft of the will and there in his presence and in the presence of Dr. Schneider, the will was executed.  In the meantime the testator's wife had died.

By the March 27th will the testator gave a bequest of $1,000 to the Evangelical Lutheran church of which the testator was a member.  He devised his entire estate to his wife but provided that in the event of her predeceasing him one sixth should go to his brother, Nels Peterson; one sixth to his brother, William Peterson; one sixth to his sister, Minnie Vettelson; one sixth to his wife's brother, Henry Bischoff; one sixth to Edna Borkenhagen and Irene Travis, share and share alike, who are the children of Emilie Stelloh, a deceased sister of his wife; and one sixth to Martha Marquardt, Margaret Meyer, Mary Bischoff, and Frederick Bischoff,

share and share alike, who are the children of Reinhard Bischoff, a deceased brother of his wife.

After the execution of the first will, the testator asked Mr. O'Brien if the will would be all right in view of the fact that his wife had passed away. Mr. O'Brien told him that it would, that the property would pass to the others named in the will. The testator then mentioned that his brother Peter was not named in the will and he wished to include him. Mr. O'Brien then suggested that he redraft the will and asked him if he wanted each side to get one half, his relatives one half and his wife's relatives one half, or whether he wanted it divided in one-sevenths. He gave Mr. O'Brien to understand that he wanted one seventh to each one and that the interest of Peter and Nels Peterson were to be contingent upon their surviving him.

On April 4, 1940, the testator executed the will offered for probate. The only change made in the redrafting of the will was that the testator's brother Peter was included and his share and that of the brother Nels were to be contingent upon their surviving him.

On August 30, 1939, the testator sustained a paralytic stroke. It was caused by a cerebral hemorrhage or apoplexy and resulted in a paralysis of the spastic or rigid type of his right side, including both arm and leg. His speech was impaired or impeded as a result of a partial paralysis of the muscular vocal function following the hemorrhage. From that time on the testator was bedridden and compelled to lie in a semireclining position, although at times he was able to and did sit up in a wheel chair. Over a period of time the testator's condition appeared to improve. He was further handicapped by reason of the fact that he was right-handed and the paralysis made his right arm and hand practically useless. He had been almost blind in his left eye since childhood and the stroke seemed to have affected his right eye. The amount

of impairment of his sight could not be accurately determined. He indicated his wants, desires, and ideas by word of mouth, facial expression, and gestures. At times he displayed impatience with his inability to formulate some words by facial expressions and gestures. He partook of the sacrament of the Lord's Supper from time to time, which was administered to him by his pastor.

The circumstances attending the execution of the will of April 4, 1940, are as follows: Mr. O'Brien had arranged with Dr. Schneider to be present. The two entered the room and closed the door. Mr. O'Brien read the will of April 4, 1940, to the testator and asked him if he understood it. He nodded his head indicating that he did. He again went over it, provision by provision, and asked him each time if he understood the provision and he replied that he did. Some of the provisions Mr. O'Brien explained to him in layman's language after which he asked him if that was what he wanted. The testator nodded his head, Yes. He asked him if this was his last will and testament which he was about to sign. He said "Yes." He asked him if he wanted Dr. Schneider and him to sign it. He said "Yes." While he had signed the March 27, 1940, will, he was advised to make a cross, which he did, and the will was then witnessed by Mr. O'Brien and Dr. Schneider.

In his opinion the trial court said:

"The first question for determination is whether August Peterson, after his stroke, retained sufficient mental capacity to make his last will and testament on April 4, 1940. The contestants have presented an array of witnesses, who testified that his condition was such that he could not possibly have met the test of testamentary capacity prescribed by the decisions of our court. Some of these witnesses have gone so far as to give it as their conclusion that the decedent at that time had no mentality whatever. Upon the other hand a number

of highly creditable witnesses testified that it was perfectly possible to communicate with the decedent despite the fact that his vocal organs functioned only with difficulty. The whole point of the objectors' case is that the will must have been obtained by improper means because the disabilities which he had suffered totally disabled him from conceiving of his testamentary purposes. . . .

"The clear and undisputed fact is that the decedent did communicate to Mr. O'Brien his desires regarding his will. This is made clear by the deposition of Dr. Schneider, the testimony of Mr. O'Brien, and of the proponent [Irene Travis, a legatee]. This testimony is uncontradicted. There was no other way in which Mr. O'Brien could have secured this information, in view of the testimony, uncontradicted in the record, that he consulted with no one concerning it except merely for the purpose of supplementing the information as to the exact names of the beneficiaries who had already been designated by the decedent. . . .

"Obviously the testator must have been able to do that which he is shown to have done. The assertions of the other witnesses to the effect that the decedent could not have communicated his testamentary desires is hardly persuasive in view of the undisputed fact that this is exactly what he has done."

Among those who testified in support of the testator's capacity was Rev. Elmer Hjorkland. He was pastor of the Ascension Lutheran church in Milwaukee, which the decedent attended. He called on the decedent frequently during the period in question, occasionally administered to him the sacrament of communion according to the prescribed ritual of the Lutheran church. At such times it was his duty imposed by the teachings of his church to determine whether the recipient of the sacrament understood the meaning of what was done.

Dr. Herbert W. Powers, a specialist in nervous and mental disorders, testified that the fact that the stroke deprived the deceased of the control of the muscles of the vocal cords did not show that it impaired his mental processes.

We have cited these facts to show that there is testimony which if believed supports the trial court's conclusion that the deceased was competent to make a will. The appendix in this case contains three hundred eighty-four pages of condensed testimony. A careful examination of this testimony shows that most of the adverse testimony was based upon the fact that the deceased was unable to plainly communicate his thoughts; that it required some effort for him to do so; that he appeared at times not to have a clear recollection of past events; but all this testimony might be true and as the trial court points out it does not establish by a clear and satisfactory evidence that the testator was mentally incompetent. Competent expert medical evidence was produced by both sides. As is usually the case, that medical evidence was in direct conflict. In a carefully prepared decision, the trial court concludes that the competency of the testator was clearly established by the great weight of the evidence.

No useful purpose would be served by setting out the testimony which tends to support the position of each of the parties to this litigation. We have carefully examined it and are satisfied that the trial court arrived at the correct conclusion. The result depended upon the credibility and interest of the witnesses which are for the trier of the fact.

The fact that the testator himself pointed out that his brother Peter had been omitted from the first will and asked to have him included in the last will is of itself quite convincing that the testator knew the condition of the property, its relation to the persons who might properly be his beneficiaries, and the scope and bearing of his will; and could hold these matters in mind a sufficient length of time to perceive their obvious relationship to each other and to be able to perform a rational judgment in relation to them.

A considerable part of the evidence offered by the contestants on the trial was that of lay witnesses who testified that

in their opinion the testator was mentally incompetent. As was said in the case of *McMaster v. Scriven* (1893), 85 Wis. 162, 169, 55 N. W. 149:

"Quite a number of witnesses, particularly on the part of the proponent, expressed opinions unfavorable to her testamentary capacity, but the facts they state to justify their conclusions are few, and do not throw much light on the question. Mere opinion, without substantial grounds to justify it, is of comparatively little value. Several other witnesses, and among them her attending physician and Mr. Wickhem, who drew the will, give quite clear and convincing testimony showing that she was fully competent to make a testamentary disposition of her property at the time she executed this will."

It was held that the evidence sustained the findings of the circuit court that the testatrix had sufficient testamentary capacity to make a will.

It is apparent from the record that while the testator had difficulty in expressing himself, the difficulty was not due to his mental condition but to the impairment of the organs of speech and expression due to the paralytic stroke. The will in this case is a perfectly reasonable and natural one. The property had been accumulated through forty years or nearly forty years of their married life by himself and his wife. In the first will he left the property with her in the event that he predeceased her, to dispose of as she saw fit. By the will admitted to probate he gave a proportionate share to her family and the remaining four sevenths to his family, a highly considerate and fair disposition of their joint accumulations.

The contestants contend that Dr. Schneider was by reason of the provisions of sec. 325.21, Stats., incompetent to testify to the execution of the will and the condition of the patient. It satisfactorily appears from the record that Dr. Schneider signed the will as an attesting witness at the request of the testator. It is well established that where a testator requests

a physician to become a witness to his will, he thereby waives any privilege which would otherwise exist as between him and his physician. *Maine v. Maryland C. Co.* (1920) 172 Wis. 350, 178 N. W. 749.

We find no evidence which, fairly construed, tends to establish undue influence and for that reason do not discuss that aspect of the case.

It is clear that the objectors have not established by clear, satisfactory, and convincing evidence that the testator was incompetent to make the will of April 4, 1940.

*By the Court.*—Judgment affirmed.

FOWLER, J., dissents.

* Motion for rehearing denied, without costs, on July 1, 1947.